02-12-293-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-12-00293-CV

 

 


 
 
 In
 the Interest of C.J.G.
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 323rd District
 Court
  
 of
 Tarrant County (323-93811J-10)
  
 January
 4, 2013
  
 Opinion
 by Justice Dauphinot
 
 


 

JUDGMENT

 

This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Lee Ann Dauphinot








 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-12-00293-CV

 

 


 
 
 In the Interest of C.J.G.
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

After
a bench trial, the trial court terminated the parental rights of Appellant J.R.
to his two-year-old son, C.J.G.  In four issues, J.R. contends that the
evidence is legally and factually insufficient to support the trial court’s
judgment.  Because we hold that the evidence is legally and factually
sufficient to support termination, we affirm the trial court’s judgment.

Statement
of Facts

In
December 2010, the Texas Department of Family and Protective Services (TDFPS) removed
C.J.G., who was less than two months old, from his mother, who is not a party
to this appeal, on the bases of neglect and her repeated statements that she
wanted to give him up.

On
February 29, 2012, the trial court entered an order for actions necessary for J.R.
to obtain the return of the child.  The order provides,

IT IS ORDERED that [J.R.]
comply with the following:

. . . .

3. [J.R.] will
complete a psychological evaluation with Dr. Nichelle Wiggins . . . .

4. [J.R.] will follow
any and all recommendations of his psychological evaluation with Dr. Nichelle
Wiggins . . . [.]

5. [J.R.] will obtain
and maintain appropriate housing for himself and [C.J.G].

6. Within ten (10)
days of this agreement, [J.R.] will provide CPS written documentation of said
housing, i.e.[,] a lease or similar documentation that lists him as an
occupant.

7. [J.R.] will obtain
gainful employment.

8. Within ten (10)
days of obtaining gainful employment, [J.R.] will provide CPS written
documentation of said employment.

9. If employed, by
the fifth day of each month, [J.R.] will provide to CPS copies of [his]
paystubs from the previous month.

10. If [J.R.] is
unable to obtain gainful employment, [he] will provide CPS written
documentation of sources of income with which he will provide food, shelter,
clothing and basic necessities for himself and [C.J.G].

11. [J.R.] will
maintain weekly contact with Case Worker Tyra Sasita [by mail or telephone]
and/or via e-mail . . . to provide service plan progress updates.

At
trial, J.R. testified that he is twenty-six years old and lives with his mother
at an apartment complex in Arlington; that he does not know how much the rent
is; that he does not drive, know how to drive, or have a driver’s license; that
his eyeglasses were broken in a fight a long time ago; and that he has not worn
eyeglasses since that time.  J.R. testified that he had never had a job but had
completed a job program where he learned to stack things on shelves.  He had
not applied for any jobs.

J.R.
testified that he receives periodic disability checks.  He did not know the
amount of each check.  He explained that his guardian, who is not his mother, is
the payee for his disability checks.  He testified that he is paid twice a
month, and he was not sure but believed that he receives $60 on one pay date
and $40 on the other.  He further testified that he had never lived by himself
and does not have a bank account.  He testified, however, that he does know how
to write a check because he had learned in school.

He
also testified that he passed all his classes in school but did not receive a high
school diploma because he was “[s]low in classes and stuff like that.”  But he
further testified that he learned to cook and can “make everything.” 
Additionally, he testified that he does his own laundry.

J.R.
testified that he had not been diagnosed with a mental illness or deficiency
or, to his knowledge, mental retardation; he was able to define the term
“mental retardation” for the trial court.  He also testified that he has
epilepsy and takes medication for that condition.  He stated that he can see with
and without his eyeglasses.  We note that an MHMR record provides that J.R. “is
considered to be legally blind in his right eye with substantially poor vision
in his left eye.”

J.R.
testified that he is C.J.G.’s father and that DNA testing confirmed his status
as the baby’s father.  He could not remember which hospital the baby was born
in but did remember being at the hospital, and he stated that C.J.G. weighed “six
or seven or eight ounces, something like that” at his birth.  J.R. testified
that C.J.G. and his birth mother lived a short time with J.R. after leaving the
hospital.  J.R. additionally testified that the birth mother neglected C.J.G.
but that he sanitized bottles and fed the baby.  But J.R. also testified that
even though the birth mother was neglecting C.J.G., he did not stop her from moving
out of his apartment with C.J.G.

When
asked how much money he would need each month to take care of C.J.G. if C.J.G.
were placed in his care, J.R. said, “I’d say about—I don’t know.  It costs a
lot of money to take care of a little baby,” and “[l]ike a hundred to like
200.”  J.R. said he would spend the money on clothes, diapers, and bathing
supplies for the baby.  J.R. did not know what size shoes or clothes C.J.G.
wore or what medication he was on at the time of trial but also testified that
“they” had not told him that information.

J.R.
additionally testified that a person’s normal temperature is “about 150” but
that a person with a fever would have a temperature “[b]elow 90.”

When
asked if C.J.G. was slow, J.R. testified that the baby was “kind of like [J.R.]”
but also “very active.”  J.R. knew of no special doctors that C.J.G. saw but
was aware that he went to a special place that provided help for babies, help
which J.R. thought was psychiatric.  J.R. testified that if he gained custody,
he would take C.J.G. wherever he needed to go.  But he admitted that he would
have to depend on family members for transportation.

J.R.
could not initially remember C.J.G.’s birth date or year but knew that he was a
year old and walking and talking.  When asked what he would feed C.J.G. if he
were taking care of him, J.R. replied that he would feed the child Ritz
crackers and “[f]ood and stuff like that.”  When asked what he would do if C.J.G.
were returned to him that day, J.R. stated that he would “probably” need to
“get a ride” and a job.  He admitted that he had no money saved.

When
asked if he “remember[ed] being in court and a judge order[ing] [him] to do
some stuff for [him] to be able to get [C.J.G.] back,” J.R. answered, “Yes.”  He
testified that he saw the caseworker, Tyra Sasita, most Mondays and that his
visits with C.J.G. were on Mondays.  But he also testified that he had problems
getting to the visits at all or on time because he did not “get rides most of
the time.”

J.R.
admitted that he had been ordered to have a psychological evaluation completed
by Dr. Nichelle Wiggins.  When asked whether he had complied with that order
and whether Sasita had asked him to get a psychological evaluation from Wiggins
a couple of times, J.R. excused his noncompliance because he lacked
transportation.  When asked whether he refused to participate in a
psychological evaluation with Wiggins on the date that he actually went to her
office, J.R. testified that he just did not understand the questions she asked.
 He also testified that he refused to sign paperwork for her.

J.R.
also admitted that he had not provided paperwork regarding his apartment lease
or disability payments to Sasita.

J.R.
recognized that C.J.G. and his clothes were clean on visits and that the foster
parents sent snacks and toys to the visits.

J.R.
testified that his mother was not at trial because she had been sick.  He also
testified that if his mother could not live with him, he would live with his
sister, but he admitted that he had been told that the same sister could not
have custody of C.J.G. because of her background and that CPS had rejected his
brother as a potential placement as well.

J.R.
did not return after the first day of trial to complete his testimony.

Wiggins
testified that she reviewed an MHMR psychologist’s report providing that J.R.
had been diagnosed with mild mental retardation.  The report also noted that he
had epilepsy and visual impairment.  Further, he scored a 48 on the global
adaptive functioning scale, which she described as moderate-functioning.

Wiggins
testified that she never formally evaluated J.R.  He missed several
appointments and then finally arrived for an appointment late.  Wiggins testified:

[J.R.] arrived 30
minutes late.  He did not present with any identification.  When asked could he
write down his demographic information such as name, date of birth, Social
Security number, he became nervous and said he could not do that and basically
he said he wanted to go back home and get his identification and get his mother
to come back with him.  I said that would be fine, even though we would be starting
later than usual, and so he left and then he came back around 12:10—and the
appointment was originally scheduled for 9:30—he returned around 12:10, and
basically he was alone—he didn’t have his mother at that time—he refused to
sign any paperwork, he did have his identification, but he basically said he was
not willing to do any part of the evaluation, even though it was court-ordered.

Based
on that day in her office and her observations of him in court, Wiggins opined,

Overall,
I would agree and I would endorse the findings that he does present as a person
who has limited cognitive skills.  He has very limited comprehension.  His
ability to recall specific information that is important in parenting, such as
just being able to get his child’s date of birth accurately, is diminished.

He
presents as a person who has mild mental retardation, and those findings seem
to be appropriate to what I was able to observe.

Wiggins
also stated that she would have serious concerns about J.R. being the primary
caregiver of a one-year-old child and that his mild mental retardation, coupled
with his other health issues, “could” affect his ability to parent
independently and to provide for the physical, emotional, and mental needs of
the child.

The child’s
ad litem attorney asked Wiggins why she used the conditional word “could”
instead of “would.”  Wiggins answered,

Well,
the literature and my own experience, because I used to work with MHMR clients
and do the determinations of mental retardation, and I’ve interacted quite
extensively with MR clients, there are some parents that can parent effectively
and they have mental retardation, but there is a lot of support in place for
them.  They’ve been able to achieve the highest level possible at their range
of mental retardation, which some people can get up to sixth or seventh-grade
reading level, so it depends on the individual.  It depends on their
educational exposure, the type of environment in their home; it depends on the
type of support that they have at the time they have the child and how they
respond to the interventions that are offered.

The
ad litem attorney then asked if J.R. had reached a level of “intellectual
attainment and that level of other things necessary to where he could take care
of [C.J.G.] for the rest of his life[.]”  Wiggins answered,

Based on observation
of him and the information that I was able to gather, I would say no.  He’s
never held a job.  You look at one’s adaptive skill.  He’s never been able to
hold a job, no vocational skills, he didn’t even know what his monthly income
was from SSI, he had no ideas about budgeting, he wasn’t able to demonstrate an
understanding of safety issues like what’s the normal body temperature for a
person when that question was asked of him.  He gave a very erroneous answer,
so basically, just watching him and listening to him and reading about his
findings, I was able to conclude that he really has not reached a very high
level for someone who has mild mental retardation.

Wiggins
also testified that J.R. had not demonstrated any independent living skills.

But she
admitted the possibility that J.R. could parent with help. 
Specifically, Wiggins admitted that services available through MHMR, the
Association of Retarded Citizens (ARC), and Volunteers of America could help
J.R. with his parenting skills, but she testified that his history of frequently
starting and stopping MHMR services was a major concern.  She admitted that she
had no idea whether J.R. had participated in or knew of these services because
“he refused to go through the evaluation and assessment process with [her].”  She
testified that in refusing treatment,

He
just said he was not going to do it and his mother thought it was not best for
him to do it and he was just going to refuse, and he said there was no way no
chance he would come back for the evaluation, no matter what they said to him.

Wiggins
testified that J.R.’s lack of family support, as demonstrated by their absence from
trial, including the absence of any telephone calls from his family explaining
his absence on the second day of trial, would be a significant factor in his
ability to respond to emergencies and the needs of C.J.G.

When
answering a hypothetical question regarding a mentally retarded parent’s
failure to fulfill court-ordered requirements and cause for concern regarding
his engaging in services in the future, Wiggins answered,

.
. . .  Hypothetically speaking, whether a person has mental retardation or they
don’t have mental retardation, really it should be based upon the individual
and whether or not they were able to successfully complete those required
components to demonstrate they can parent effectively, so even if you take away
the fact that he has mental retardation, you’re looking at the individual and
holding him to the same standards as everyone else, I would say I would have
serious concerns, because you could have people with average intelligence and
they fail to follow through.  They fail to be able to demonstrate that they can
handle those types of requirements effectively, so just looking at him as a
person, yes, I would have concerns if he’s not reliable, he’s not responsible,
he fails to follow through, and he hasn’t been able to demonstrate that he can .
. . parent effectively.

On
cross-examination by J.R’s counsel, Wiggins did identify some of J.R.’s
accomplishments:

[B]asically,
[J.R.] has been able to get a state-issued identification card, which I thought
good.  Even though he arrived late for an appointment, he still showed up and
he expressed why he didn’t want to go through the assessment and he was willing
to sign off saying he declined services.

He
has followed through with MHMR to go through an evaluation with the assistance
of his mother being with him based on the report.

He
was able to recall one of the medications he took, even though he couldn’t
recall the other two.

He
was able to . . . the best of his ability answer questions.  Even though he had
diminished comprehension, he tried, and even though he became nervous and a
little frustrated at times, there was no outward display of aggression or ever
any outward displays of an emotional disturbance, so those are positive things
for him,

but
she also stated that she observed “a lot more deficits” than positives.

Wiggins
admitted that “[J.R.] was able to give some accurate answers, which is not
unusual with people with mild mental retardation.  They may be able to answer
some things correctly and then some things they just don’t have a clue about.”  As
an example, she pointed out that he had known that the birth mother was
neglecting C.J.G., but

he didn’t know how to
report that.

The
question was asked of him what could he have done differently, and he really
didn’t have a comprehension answer for that.  He really didn’t know how to
protect the child.  He was aware something wasn’t right, but he didn’t know
what steps to take to protect the child and keep the child out of harm’s way.

Wiggins
explained that J.R. is “functioning like an eight-year-old person based upon
the test results, and so an eight-year-old person may know right from wrong, a
person at that mental level, but they may not know the next steps or the next
logical problem-solving interventions to take.”

Tyra
Sasita testified that she is the TDFPS conservatorship worker for this case.  She
testified that she developed a service plan for J.R. and that the trial court
also ordered that he complete certain services to have C.J.G. returned to his
care.  She testified that he failed to complete a psychological evaluation with
Wiggins and that this failure was significant because TDFPS needed to obtain
his functioning level and wanted a second opinion to compare to the MHMR
evaluation.  We note that Wiggins relied on the functioning
level—eight-year-old—provided by the MHMR report and testified that because of
the standardization of the testing, if she had performed the evaluation, the
number would not have “var[ied] very much.”

Sasita
also testified that she wanted J.R. evaluated because of the level of
functioning he showed during visits with C.J.G.  J.R. could not change the
child’s diapers, could not calm or soothe the baby, and became very nervous
when he was with the child, so nervous that Sasita could see him shake.  Sasita
further stated that J.R. would hold C.J.G. so long that the child would become
uncomfortable and want to spend the majority of the visit with the case aide.  Sasita
additionally testified that J.R. would not play with C.J.G. at the visit or
feed him:  “[J.R.] has to be prompted to do everything.”

On
cross-examination she identified other major concerns:

The ability to play
with him or to even pick up on the cues that [C.J.G.] doesn’t want to be held. 
He’s walking now.  He wants to walk, he wants to play, he wants to explore.  But
he doesn’t get those cues.  When [C.J.G.] becomes whiny, he gets a little
agitated, so that’s when [J.R.] has to be prompted because he will continue to
hold [C.J.G.] through that, and so that [C.J.G. and J.R.] can feel comfortable,
someone will say, you know, [J.R.], why don’t you try putting him down?  Or
here’s a toy.  Try to get him to play with this train or here are his cookies
in his bag, here is some juice, but those things you have to tell him.

Sasita
further testified that J.R. had once told her that he thought C.J.G. would walk
and talk when he was about seven years old.

Sasita
additionally testified that J.R. failed to follow more of the trial court’s
directives.  Because he did not comply with the requirement to submit to a
psychological evaluation by Wiggins, J.R. necessarily did not comply with the
trial court’s order to follow through with any and all of her recommendations.  Nor
did he comply with the trial court’s order to obtain and maintain appropriate housing
for himself and C.J.G.  Sasita explained that when she visited the apartment
J.R. shares with his mother,

It
was a two-bedroom apartment.  When [Sasita] arrived, [J.R.] and a friend were
sleeping in the living room on an air mattress.  His mother was in one of the
bedrooms.  She was asleep and there was a room that was just locked.  There was
a padlock on that room, and she did open the door for [Sasita], and there were
just like storage areas there.  Furniture was very, very minimal.  The kitchen
did have food.  There was a television there, but there was nothing there for a
baby.

Sasita
also testified that J.R. failed to comply with the trial court’s orders that he
provide written documentation of his housing and that he obtain gainful
employment and provide documentation (including pay stubs) thereof.  She
further testified that J.R. failed to comply with the alternate order that he
provide written documentation of sources of income with which he would pay for
food, shelter, clothing, and basic necessities for himself and C.J.G.  Sasita
testified that she had asked J.R. how much his monthly disability check was but
that he had replied that his mother handles it, and his mother would not tell
Sasita the amount of the check.  Sasita verified that J.R. receives disability
benefits but was unable to verify the amount.

Sasita
further testified that she and J.R. do not have direct communication because it
makes him nervous, so she speaks to him through the case aide if there is an
emergency.

Sasita
also testified that J.R.’s mother had told her that she does not believe that
J.R. can parent independently and that she plans to help him, but she attended
very few visits with C.J.G.  J.R.’s mother also did not attend trial.

Sasita
further testified that J.R.’s visits with C.J.G. have been very sporadic and
that transportation has been an issue for him.  She admitted that she believed
that he had attempted to attend all scheduled visits with C.J.G., but she also
testified that several visits did not occur because he did not come or because
he was late.  She stated that he did not follow through with her suggestion
that he get help from MHMR with transportation; instead, he depended on his
family.

Sasita
testified that she would not favor placement of C.J.G. with J.R. in the home
with his mother so that she could help with her grandson because

[a]t this point his
mom has not shown that she can be a caregiver.  One main concern is she does
not have employment.  She will not talk about how she lives from day to day.  [Sasita
believes] that [J.R.’s mother is using] some of [J.R.’s] money [to] hous[e] herself.

She
has some medical concerns, she has some criminal history, and she didn’t raise [J.R.]
herself.  [J.R.] was primarily raised by his grandmother.  It’s only been since
he’s an adult that he’s lived with his mother consistently.

Sasita
further testified that C.J.G. is in a dual-licensed adoption-motivated
placement.  He has been in that foster home for a signficant period of time
and, to Sasita, acts as if the foster family is his family; she testified that
he “has adjusted very well.”  Sasita had no concerns that an adoption by the
current placement would be delayed should the trial court terminate the
parents’ rights.

Sasita
testified that C.J.G. will require a lot of medical attention, but she did not
know how long he would need medical care.  Physically, there have been concerns
about C.J.G.’s eye.  He wore patches for some time, and several MRIs were
performed.  She also reported that he had had some issues with eating and
drinking but that therapists had worked with him, and he had made progress. 
Finally, she also stated that he is somewhat developmentally delayed—his speech
is not at the level it should be and “[he has] some other little motor skills
issues”—but overall, “he’s doing okay.”  Sasita doubted that J.R. could ensure
that C.J.G.’s medical needs were met.

Sasita
also testified that there was no bond between J.R. and C.J.G. and that J.R. had
never asked her about C.J.G., how he was doing, or what services were being
provided; J.R. had asked her nothing about the child’s wellbeing.

After
the trial, the trial court signed an order terminating the parents’ rights to
C.J.G.  Among other findings, the trial court found that J.R.

failed to comply with
the provisions of a court order that specifically established the actions
necessary for [him] to obtain the return of [C.J.G.,] who has been in the
permanent or temporary managing conservatorship of [TDFPS] for not less than
nine months as a result of [C.J.G.’s] removal from the parent under Chapter 262
for abuse or neglect[,]

and
also found that “termination of the parent-child relationship, if any exists or
could exist, between [J.R.] and [C.J.G.] is in [C.J.G.’s] best interest.”[2] 
In his second and fourth issues, J.R. contends that the evidence is legally and
factually insufficient to support these two findings.

Legal
and Factual Sufficiency of the Evidence to Support Termination

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination
is in the best interest of the child.[3]
 Both elements must be established; termination may not be based solely on the
best interest of the child as determined by the trier of fact.[4]

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the challenged ground for termination was
proven.[5] 
In this case, we determine whether the evidence is such that the trial court
could reasonably form a firm belief or conviction that (1) J.R. failed to
comply with the provisions of a court order that specifically established the
actions necessary for him to obtain the return of C.J.G. and (2) termination of
J.R.’s parental rights is in C.J.G.’s best interest.[6]

We
review all the evidence in the light most favorable to the finding and
judgment.[7] 
We resolve any disputed facts in favor of the finding if a reasonable
factfinder could have done so.[8] 
We disregard all evidence that a reasonable factfinder could have disbelieved.[9]  We consider
undisputed evidence even if it is contrary to the finding.[10]  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.[11]

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.[12]  And even when
credibility issues appear in the appellate record, we defer to the factfinder’s
determinations as long as they are not unreasonable.[13]

In
reviewing the evidence for factual sufficiency, we give due deference to the trial
court’s findings and do not supplant the judgment with our own.[14]  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that J.R. violated subsection (O) of section 161.001(1)
and that termination of the parent-child relationship would be in the best
interest of C.J.G.[15] 
If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.[16]

Further,
there is a strong presumption that keeping a child with a parent is in the
child’s best interest.[17] 
Prompt and permanent placement of the child in a safe environment is also
presumed to be in the child’s best interest.[18] 
The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s
age and physical and mental vulnerabilities;

(2) the
frequency and nature of out-of-home placements;

(3) the
magnitude, frequency, and circumstances of the harm to the child;

(4) whether the
child has been the victim of repeated harm after the initial report and
intervention by the department or other agency;

(5) whether the
child is fearful of living in or returning to the child’s home;

(6) the results
of psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

(7) whether
there is a history of abusive or assaultive conduct by the child’s family or
others who have access to the child’s home;

(8) whether
there is a history of substance abuse by the child’s family or others who have
access to the child’s home;

(9) whether the
perpetrator of the harm to the child is identified;

(10) the
willingness and ability of the child’s family to seek out, accept, and complete
counseling services and to cooperate with and facilitate an appropriate agency’s
close supervision;

(11) the
willingness and ability of the child’s family to effect positive environmental
and personal changes within a reasonable period of time;

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

(A) minimally
adequate health and nutritional care;

(B) care,
nurturance, and appropriate discipline consistent with the child’s physical and
psychological development;

(C) guidance
and supervision consistent with the child’s safety;

(D) a
safe physical home environment;

(E) protection
from repeated exposure to violence even though the violence may not be directed
at the child; and

(F) an
understanding of the child’s needs and capabilities; and

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.[19]

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires
of the child;

(B)     the
emotional and physical needs of the child now and in the future;

(C)     the
emotional and physical danger to the child now and in the future;

(D)     the parental
abilities of the individuals seeking custody;

(E)     the
programs available to assist these individuals to promote the best interest of
the child;

(F)     the
plans for the child by these individuals or by the agency seeking custody;

(G)     the stability
of the home or proposed placement;

(H)     the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

(I)      any excuse
for the acts or omissions of the parent.[20]

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases.[21] 
Furthermore, undisputed evidence of just one factor may be sufficient in a
particular case to support a finding that termination is in the best interest
of the child.[22] 
On the other hand, the presence of scant evidence relevant to each factor will
not support such a finding.[23]

The
evidence shows that J.R. did not comply with several portions of the trial
court’s February 2012 order.  J.R. refused to allow Wiggins to perform a
psychological evaluation and did not provide information to TDFPS from which it
could determine that he could provide for C.J.G.’s basic needs or heightened
medical needs.  Looking at the evidence in a favorable light to the finding as
well as with merely appropriate deference to the finding, we hold that the
trial court could have formed a firm belief or conviction that J.R. violated
its order providing steps necessary for J.R. to take to secure the return of
his child.  We therefore hold that the evidence is legally and factually
sufficient to support the trial court’s finding regarding subsection (O) of
section 161.001(1).[24]  We
overrule J.R.’s second issue.

Similarly,
though J.R.’s testimony shows his concern and affection for C.J.G., the
evidence taken as a whole demonstrates that J.R. does not have the requisite
skill set or support system to shoulder the responsibility of raising C.J.G.
and providing for his needs.  The evidence further shows that C.J.G. is in a
home with foster parents who would like the home to be permanent, that he has
lived there quite a while and has adjusted well, and that developmentally, he
continues to improve and is “okay.”  Thus, reviewing the evidence in a light
favorable to the best interest finding as well as in a merely deferential
light, we hold that the trial court could have reasonably formed a firm
conviction or belief that termination of J.R.’s parental rights is in C.J.G.’s
best interest.[25]  We
therefore hold that the evidence is legally and factually sufficient to support
the trial court’s best interest finding against J.R.  We overrule J.R’s fourth
issue.  Having overruled J.R.’s second and fourth issues, we do not reach his
remaining issues.[26]

Conclusion

Having
overruled J.R.’s dispositive issues, we affirm the trial court’s judgment
terminating his parental rights to C.J.G.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

 

DELIVERED:
January 4, 2013









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code
Ann. § 161.001(1)(O), (2) (West Supp. 2012).





[3]Id. § 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).





[4]Tex. Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34
S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).





[5]In re J.P.B.,
180 S.W.3d 570, 573 (Tex. 2005).





[6]See Tex. Fam. Code
Ann. § 161.001(1)(O), (2).





[7]J.P.B., 180 S.W.3d at
573.





[8]Id.





[9]Id.





[10]Id.





[11]Id.





[12]Id. at 573, 574.





[13]Id. at 573.





[14]In re H.R.M.,
209 S.W.3d 105, 108 (Tex. 2006).





[15]See Tex. Fam. Code
Ann. § 161.001(1)(O), (2); In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).





[16]H.R.M., 209 S.W.3d
at 108.





[17]In re R.R.,
209 S.W.3d 112, 116 (Tex. 2006).





[18]Tex. Fam. Code Ann.
§ 263.307(a) (West 2008).





[19]Id. § 263.307(b);
R.R., 209 S.W.3d at 116.





[20]Holley v. Adams,
544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).





[21]C.H., 89
S.W.3d at 27.





[22]Id.





[23]Id.





[24]See Tex. Fam. Code
Ann. § 161.001(1)(O).





[25]See id. § 161.001(2).





[26]See Tex. R. App.
P. 47.1.