

**NUMBER 13-08-00112-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI** - **EDINBURG**

---

**IN THE INTEREST OF C. W., A CHILD**

---

**On appeal from the 156th District Court
of San Patricio County, Texas.**

---

**MEMORANDUM OPINION**

**Before Justices Rodriguez, Garza, and Vela
Memorandum Opinion by Justice Rodriguez**

Appellant, M.H.,[1] appeals from the trial court's order terminating her parental rights

to her son, C.W.[2] By two issues, M.H. challenges the legal sufficiency of the evidence to

---

[1] *See* TEX. R. APP. P. 9.8(b)(2)(providing that "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").

[2] C.W.'s father, attempted to appeal from the judgment terminating the parental rights of C.W.'s mother, M.H. On January 8, 2009,after severing the father's appeal, this Court, dismissed the father's appeal for want of jurisdiction. *See In the Interest of C.W.*, No. 13-08-00728-CV, ___ Tex. App. LEXIS ___ (Tex. App.–Corpus Christi January 8, 2009, no pet. h.) (mem. op., not designated for publication).

support the findings that she violated section 161.001(1) of the Texas Family Code and that termination of her parental rights was in the best interest of C.W.[3]  *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (Vernon Supp. 2008).  We affirm.

## I. BACKGROUND

On April 18, 2007, M.H. took her nineteen-month-old child, C.W., to a chiropractor after she noticed he was limping.  The chiropractor told M.H. to take C.W. to his pediatrician, who ordered x-rays of the child's leg.  According to M.H., C.W.'s pediatrician informed her that C.W. had a pulled muscle and required warm baths.  On April 20, 2007, M.H. and C.W. traveled out of town to a family reunion with M.H.'s fiancee, J.G.  Because C.W. was limping and required assistance walking, M.H. carried him or put him in a stroller.

On April 22, 2007, during the trip back home, M.H. noticed that C.W.'s leg was swollen.  M.H. took C.W. to the hospital.  Nancy S. Harper, M.D., medical director for the Child Abuse Referral and Education (CARE) Network team at Driscoll Children's Hospital, found that C.W. had two broken bones.  The first was visible on the x-rays taken by C.W.'s pediatrician.  The second break occurred after the first x-rays were taken.  In a child-abuse evaluation dated April 23, 2007, Dr. Harper described the second break as a fragmented impacted fracture with buckling.  According to Dr. Harper, C.W.'s leg was swollen, deformed, and did not have a pulse.  C.W.'s injury required that slits be cut into the compartments of his lower leg in order to reduce the swelling.  A cast was then placed on

---

[3] This Court received a supplemental brief from M.H.  However, M.H. has not sought leave to file the supplemental brief, which raises substantive issues not addressed in her original brief.  Because M.H.'s supplemental brief has never been filed with this Court, we decline to review it.  *See* TEX. R. APP. P. 38.7; *Standard Fruit and Vegetable Co., Inc. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998) ("Generally, a party must seek leave of court to file an amended or supplemental brief, and the appellate court has some discretion in deciding whether to allow the filing.").

his leg. Dr. Harper documented that C.W. had the following injuries: (1) a small midline abrasion between the eyes; (2) an abrasion to the left eye; (3) a loss of a left upper tooth; (4) an abrasion to the chin; (5) bruising to the pinna of the ear; (6) maceration and irritation of the neck folds; (7) hypopigmented scars on the abdomen that were multiple and fairly linear in configuration; and (8) a moderately swollen left lower extremity with cool toes and concerns for compartment syndrome.

M.H. entered into a safety plan with the Department of Family and Protective Services (the Department) wherein C.W. was placed with J.G.'s parents and M.H. was allowed supervised visitation. M.H. testified that she violated the safety plan by taking C.W. from J.G.'s parents' home to live at the residence she shared with J.G. The following morning, J.G. found C.W. not breathing. J.G. woke up M.H., and M.H. called 911. C.W. was transported to the emergency room. Dr. Harper was again consulted and conducted another child-abuse evaluation (May 17 child-abuse evaluation).

The Department removed C.W. from M.H.'s home and a service plan was developed that included counseling, a psychological evaluation, parenting classes, drug testing, and supervised visitation. On May 30, 2007, the Department filed its original petition for protection of a child, requesting conservatorship and termination of the parent-child relationship. After a hearing, the trial court ordered termination of M.H.'s parental rights. This appeal ensued.

## II. APPLICABLE LAW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally

existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.–Corpus Christi 2006, no pet.). Termination must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.–Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

Before terminating parental rights, the trial court must find that the parent committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. *Id.* § 161.001 (Vernon Supp. 2008); *id.* § 153.002 (Vernon 2002); *In re J.L.*, 163 S.W.3d at 84. Here, the trial court found clear and convincing evidence that M.H. (1) "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" and (2) "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E). "[A] child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.–Houston [14th Dist.] 2005, no pet.).

4

When considering whether parental termination is in the child's best interest, the following non-exhaustive list of factors should be considered: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking parental termination is not required to prove all nine factors. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (providing that these considerations are not exhaustive, "or that all such considerations must be proved as a condition precedent to parental termination"); *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App.–Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.").

## III. STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85. We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *Id.* We must also consider undisputed evidence, if any, that does not support the finding. *Id.* at 86.

5

## IV. ANALYSIS

### A. Violation of Section 161.001(1)(D) and (E)

By her first issue, M.H. challenges the evidence as legally insufficient[4] to support the trial court's finding that she violated sections 161.001(1)(D) and (E) of the family code. M.H. specifically asserts that there is no evidence to explain why C.W. stopped breathing, other than that he has asthma and apnea.[5] M.H. contends that "[i]t is not reasonable to believe that someone caused C[.]W[.] to stop breathing, when the ultimate fact is no one knows why or how C[.]W[.] stopped breathing."

In our legal sufficiency review, we first consider the evidence supporting the trial court's finding that M.H. knowingly placed or knowingly allowed C.W. to remain in conditions or surroundings which endangered his physical or emotional well-being. *See In re J.L.*, 163 S.W.3d at 85 (citing TEX. FAM. CODE ANN. § 161.001(D), (E)). We also consider the evidence supporting the finding that M.H. engaged in conduct or knowingly placed C.W. with persons who engaged in conduct that endangered C.W.'s physical or emotional well-being. *See* TEX FAM. CODE ANN. § 161.001(D), (E). This evidence includes

---

[4] Although in her issues M.H. states that the evidence is factually insufficient to support the trial court's findings, she only provides arguments and authority regarding legal sufficiency and does not provide a substantive analysis of her factual sufficiency claims. Furthermore, M.H. prays that this Court reverse the trial court's judgment, but does not seek remand. To the extent that M.H. may be complaining in her two issues that the evidence is factually insufficient to support the trial court's findings, we conclude that she has waived those arguments because she has not cited to the record or to any authority. *See* TEX. R. APP. P. 38.1(h); *Ryan v. Abdel-Salam*, 39 S.W.3d 332, 336 (Tex. App.–Houston [1st Dist.] 2001, pet. denied) ("When a party fails to include any citation of authority or discussion of relevant facts to support its sufficiency contention, 'we will not perform an independent review of the record and applicable law to determine whether the error complained of occurred.'") (quoting *Happy Harbor Methodist Home, Inc. v. Cowins*, 903 S.W.2d 884, 886 (Tex. App.–Houston [1st Dist.] 1995, no writ)).

[5] We note that C.W. had multiple injuries. The Department presented evidence showing that some of those injuries could not have been accidental. M.H. does not complain of the evidence regarding C.W.'s other injuries.

6

Dr. Harper's May 17 child-abuse evaluation. In her evaluation, Dr. Harper wrote the following:

> [C.W.] is a 19-month-old male who is referred to the CARE team physician by the emergency room for evaluation for non-accidental trauma after he presented with apnea. The presentation for apnea was quite concerning as [C.W.] had been previously evaluated for non-accidental trauma after he presented with compartment syndrome of the left leg, and an impacted and fragmented distal left tibia with impaction and buckling of the left fibula. This fracture is considered highly suspicious for non-accidental trauma as it would require a high energy axial load. The fracture was not consistent with mere lateral displacement or separation of the previous toddler's fracture (spiral fracture of the tibia).
>
> . . . .
>
> Apnea is very unusual in older children and is especially worrisome in a child previously evaluated for non-accidental trauma. . . . The differential diagnosis for apnea in a toddler includes suffocation or asphyxiation, seizure disorder, ingestion or poisoning, metabolic disorders and cardiac arrhythmia . . . . With such a highly suspicious fracture and a recent return home, this is again very concerning for non-accidental trauma such as suffocation. [C.W.] requires a close follow-up by CPS due to this unusual presentation and previous concerns for non-accidental trauma. If [C.W.] is returned to the care of an alleged perpetrator, he is at grave risk of further injury, disability, and mortality.

On cross-examination by C.W.'s attorney ad litem, Dr. Harper testified that the hospital conducted a comprehensive evaluation of C.W., and that she was very concerned that there was suffocation. Dr. Harper stated that because she did not know who injured C.W., she was "very concerned about him returning to that same environment for fear of future injury, morbidity, or even death."

The evidence also established M.H. was aware that someone had injured C.W. on other occasions. When M.H. took C.W. to the hospital because of his swollen leg, she was informed that C.W. had multiple breaks in his left leg. M.H. testified that Dr. Harper told her that the only way C.W. could have sustained the second break to his leg was if

7

someone had slammed him down feet first. According to M.H., she did not slam C.W. down feet first. When the Department asked, "So I think we can all agree that somebody purposefully hurt [C.W.]," M.H. answered, "That's what they say, yes."

Furthermore, although M.H. had been told that C.W.'s injuries were not accidental and that someone had caused his injuries, M.H. violated the safety plan by returning with C.W. to J.G.'s home. M.H. asserted that she did not know whether J.G. had ever been arrested or had used drugs. M.H. testified that although she suspected that J.G. could have hurt C.W., she has been in continued contact with him, including seeing him one week before the parental termination hearing. According to Johnny Segovia, an investigator with the San Patricio County Sheriff's Department, M.H. was still "working" for J.G. approximately one month before the parental termination hearing, and M.H. told him she was in daily contact with J.G. M.H. testified that she was concerned about allowing J.G. future unsupervised visits with their unborn child.

In our legal sufficiency review, we must resolve any disputed fact issue in favor of its finding if it was reasonable to do so. *See In re J.L.*, 163 S.W.3d at 85. In this case, M.H. has challenged the cause of C.W.'s apnea. However, it is up to the finder of fact to resolve any conflicts within the evidence. *See In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (providing that "when credibility issues are reflected in the written transcript," we must defer to the factfinder's credibility determinations as long as those determinations are not unreasonable); *In re J.L.*, 163 S.W.3d at 85 ("[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."). Dr. Harper testified that apnea is rarely seen in older children and that she was concerned that C.W. had been suffocated. When M.H. called 911 to report that C.W. was

8

not breathing, she requested police officers because she suspected that J.G. may have hurt C.W. Megan Douglas, an investigator for child protective services, testified that she came to the conclusion that an unknown perpetrator physically abused C.W. while in the care of M.H. or J.G. Because we conclude that it was reasonable to do so, we must assume that the trial court resolved this disputed fact in favor of its finding. *See In re J.L.*, 163 S.W.3d at 85.

Finally, we must also consider any undisputed evidence that does not support the trial court's finding. *See id.* at 86. However, M.H. has not pointed to such evidence, and we find none.

In viewing the evidence in the light most favorable to the trial court's findings, we conclude that there was legally sufficient evidence for a reasonable factfinder to form a firm belief or conviction that M.H. knowingly placed or knowingly allowed C.W. to remain in conditions or surroundings that endangered his physical or emotional well-being and engaged in conduct or knowingly placed C.W. with persons who engaged in conduct that endangered C.W.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E); *In re J.L.*, 163 S.W.3d at 87. Therefore, the evidence, under a clear and convincing standard, is legally sufficient to support the trial court's finding that M.H. endangered C.W. under section 161.001(1)(D), and (E). *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E); *In re J.L.*, 163 S.W.3d at 88. We overrule M.H.'s first issue.

## B. Best Interest of the Child

By her second issue, M.H. contends that the evidence is legally insufficient to support the trial court's finding that termination of her parental rights was in the best

interest of C.W. Specifically M.H. argues that there is no evidence of the identity of the perpetrator or that she knew that a perpetrator caused the injury. M.H. also asserts that "there was not clear and convincing evidence what the emotional and physical needs of the child were or that [M.H.] would not be best able to meet those needs."

In our legal sufficiency review, we evaluate the evidence supporting the trial court's finding that termination of M.H.'s parental rights was in C.W.'s best interest. *In re J.L.*, 163 S.W.3d at 84. In support of the trial court's finding, we consider all of the evidence as set out above that supported the trial court's finding that M.H. endangered C.W. in the manner described in sections 161.001(1)(D) and (E). *See id.* at 87; *In re C.H.*, 89 S.W.3d at 27.

Douglas did not believe that C.W. would be safe if returned to M.H., even if J.G. was ordered not to have any contact with M.H. and C.W. Douglas testified that termination was in C.W.'s best interest because "if [C.W.] were to return home it could result in further injury to the child, and he received injuries over a period of time that are unexplained . . . I do not feel that he is safe to return home." According to Douglas, the Department was also concerned because the injuries to C.W. were progressively worse each time. Douglas stated, "It was not just one injury, [C.W.] received numerous injuries. So the child was allowed to remain in an environment that was causing bodily injury to him." M.H.'s counsel asked Douglas what specifically led her to believe that M.H. had been neglectful, and Douglas replied, "That it was determined that these injuries were a result of child abuse. This child was in [M.H.'s] care at the time he received these injuries. And we don't know who the perpetrator is." Douglas stated that the Department determined that the perpetrator was either M.H. or J.G.. In Douglas's opinion, this was one of the worst cases of physical abuse of a child she has seen, and C.W. would not be safe if he were returned

to M.H.'s home. Douglas stated that she did not believe that C.W. would be safe with M.H., even if J.G. was ordered not to have contact with M.H. and C.W., because "she allowed [C.W.] to remain in an environment where he received injury, and I cannot rule her out as a perpetrator in the physical abuse."

According to Jocelyn Hargrove, a caseworker for child protective services, under the Department's service plan, M.H. needed to address the continuous maltreatment of C.W. by stopping the physical abuse and by not associating with J.G.[6] Hargrove testified that the goal of the plan was for M.H. to accept services, to protect C.W. from abuse, and to grasp an understanding that C.W. was physically abused. Hargrove did not believe that M.H. had met those goals because M.H. continued to indicate that she was not sure that C.W. had been abused. Hargrove testified that M.H. was not protective of C.W. and that although M.H. had completed parenting classes, M.H. had not demonstrated, as required by the service plan, that she had learned from the classes how to protect C.W. Hargrove stated that M.H. could have demonstrated this by indicating that she knew C.W. had been physically abused and that she would be willing to take "whatever steps necessary to protect him." However, M.H. denied she abused C.W. and, according to Hargrove, M.H. did not believe that J.G. was capable of physically abusing C.W. or that he abused C.W. This pattern of behavior, according to Hargrove, placed C.W. in danger by continuing a relationship with the person who may have abused C.W. Furthermore, although M.H. did

---

[6] Under the service plan, M.H. was also required to obtain full-time employment and provide income verification to demonstrate that she was able to care for C.W. without assistance. The record reflects that M.H. did neither.

take advantage of the services offered by the Department, she continued the pattern of behavior that the Department informed her endangered C.W.'s well-being.

As noted above, we must also consider undisputed facts that do not support the trial court's finding. *See In re J.L.*, 163 S.W.3d at 86. However, M.H. has not pointed to any, and we find none.

Therefore, considering the non-exhaustive list of factors identified in *Holley*, and viewing the evidence in the light most favorable to the trial court's finding, we conclude that there was legally sufficient evidence for a reasonable factfinder to form a firm belief or conviction that termination of M.H.'s parental rights was in C.W.'s best interest, including evidence supporting a finding that M.H. knew that a perpetrator caused the injury and evidence supporting a finding that M.H. would not be best able to meet the emotional and physical needs of C.W. *See In re J.L.*, 163 S.W.3d at 88; *Holley*, 544 S.W.2d at 372. The evidence, under a clear and convincing standard, is legally sufficient to support the trial court's finding that termination was in C.W.'s best interest. *Id.* We overrule M.H.'s second issue.

## V. CONCLUSION

We affirm the trial court's judgment.


                                       NELDA V. RODRIGUEZ
                                       Justice

Memorandum Opinion delivered and
filed this 22nd day of January, 2009.