**In the Interest of J.L., a Child.**

No. 04–0307.

Supreme Court of Texas.

Argued Nov. 30, 2004.

Decided April 8, 2005.

Rehearing Denied June 17, 2005.

John F. Healey Jr., Dist. Atty., David Christopher Newell, Catherine Lisa Fisher, Fort Bend County Asst. Dist. Attys., Richmond, Fred M. Felcman, Rosenberg, for the Texas Department of Protective and Regulatory Services.

Samuel Leon Childs, Houston, for J.L.

R.S. (Steve) Monks, Stephen A. Doggett, Richmond, for Betty Chavez.

Teana Viltz Watson, Sugar Land, for Chris Edwards.

Pat King, Richmond, pro se.

Justice MEDINA delivered the opinion of the Court.

In this termination-of-parental-rights case, we decide three issues: (1) whether the notice of appeal was timely filed within 20 days of the date of the modified final judgment; (2) whether the court of appeals erred in taking judicial notice of expert testimony that was not presented in the trial court; and (3) whether the evidence was legally sufficient to support the jury's finding that parental rights should be terminated. We conclude, as did the court of appeals, that the appeal was perfected timely. We, however, also conclude that the court of appeals erred in its analy-

sis of the legal sufficiency of the evidence supporting termination and should not have taken judicial notice of expert testimony. Accordingly, we reverse the judgment of the court of appeals but remand the case to that court for its review of the factual sufficiency of the evidence supporting termination.

I

This case concerns the parental rights of Bettina Lohner Chavez, who had two children out of wedlock with Chris Edwards: J.L., who was born in October 1995, and Hallie, who was born in September 1997. Bettina subsequently met Frank Chavez, whom she and her two children began living with in March 1998. In October 1999, Bettina gave birth to Frank's child. Two months later Frank lost his job and became the primary caretaker for all three children. On April 15, 2000, Bettina and Frank were married.

On May 3, 2000, while Frank was taking care of the children, Hallie became ill with a fever and nausea, which caused her to vomit several times. That night, Bettina noticed Hallie was having trouble breathing and had turned blue. Bettina called 911, and Frank began to perform CPR on Hallie. CPR was continued unsuccessfully in the ambulance, and Hallie was pronounced dead at the hospital.

A couple of weeks later, Bettina and Frank were arrested in connection with Hallie's death and criminal charges were filed. Dr. Patricia Moore, who performed Hallie's autopsy, concluded that Hallie's death was a homicide caused by blunt force trauma to the abdomen. The Texas Department of Protective and Regulatory Services (the Department) took possession of the children, placing J.L. with his biological father, Chris Edwards, and the infant with Frank's sister.

The Department thereafter filed suit to terminate the parental rights of Frank and Bettina. The Department claimed their rights should be terminated because Frank had allegedly caused Hallie's death and Bettina had knowingly endangered the children by leaving them in Frank's care when she knew of the danger he posed. The criminal charges remained pending at the time of this trial but were subsequently dismissed. The parental termination charges, however, were tried to a jury which found that (1) the parent-child relationship between Bettina and J.L. should be terminated; (2) Chris Edwards should be appointed J.L.'s sole managing conservator; (3) Bettina and Frank's parent-child relationship with the infant should not be terminated; and (4) Bettina and Frank should be appointed the infant's sole managing conservators.

The trial court rendered judgment on the jury's verdict, terminating Bettina's parental rights to J.L. Bettina appealed. The Department chose not to appeal the jury's failure to terminate Bettina and Frank's parental rights to the infant.

The court of appeals, after taking judicial notice of the testimony of an expert witness in Frank's criminal prosecution, concluded the evidence was legally insufficient to support the termination of Bettina's parental rights to J.L. 127 S.W.3d 911. The court accordingly reversed the trial court's judgment and rendered judgment restoring Bettina's rights. In reaching this judgment, the court of appeals also denied the Department's motion to dismiss Bettina's appeal as untimely, a jurisdictional issue again raised by the Department in this Court. We begin with that issue.

II

The Family Code provides that an appeal from a final judgment in a parental

rights termination suit is governed by the rules for accelerated appeals. TEX. FAM. CODE § 263.405(a). These rules require that the notice of accelerated appeal be filed within 20 days after the final judgment is signed. TEX.R.APP. P. 26.1(b). The Family Code further provides that the deadline for filing the notice of an accelerated appeal is not extended by the filing of post-trial motions. TEX. FAM.CODE § 263.405(c); *In re K.A.F.*, 160 S.W.3d 923, 926 (Tex.2005).

■ Following the original final judgment in this case, Bettina did not file her notice of appeal within 20 days, although she did timely file a motion for new trial and also a motion to modify, correct, or reform that judgment. The trial court overruled the motion for new trial but granted the other motion, correcting and making a number of changes to its original judgment. Three days after the signing of the corrected judgment, Bettina filed her notice of accelerated appeal.

The Department contends that because Bettina failed to file her notice of appeal within 20 days of the original judgment, she did not perfect her appeal in a timely manner; thus, the court of appeals did not acquire jurisdiction. While the Department does not maintain that Bettina's post-trial motions were untimely, it relies on the Family Code provision which states that such motions do "not extend the deadline for filing a notice of appeal." *Id.* Moreover, the Department argues that even if a corrected judgment would otherwise have restarted the appellate timetable, it did not do so here because the court's purpose was not to make corrections but to give Bettina a second chance to file her notice of appeal.

■ In an ordinary appeal, a timely filed post-trial motion extends both the trial court's period of plenary jurisdiction and the time for filing the notice of appeal.

TEX.R. CIV. P. 329b(e); TEX.R.APP. P. 26.1(a). The Family Code clearly anticipates the acceleration of this type of case by shortening the appellate deadlines and instructing the appellate court to render its decision "with the least possible delay." TEX. FAM.CODE § 263.405(a). It further provides that the filing of post-trial motions does not extend the time for filing a notice of appeal as might otherwise be the case. *Id.* § 263.405(c). The Family Code, however, does not purport to eliminate post-trial motions or otherwise constrict the trial court's plenary power. *Cf. Johnstone v. State*, 22 S.W.3d 408, 410–11 (Tex. 2000) (stating a formal motion for new trial was not a necessary predicate to challenge factual sufficiency of the evidence in an accelerated temporary mental commitment proceeding).

In this case, Bettina's timely filed motion for new trial extended the trial court's plenary power but did not extend the deadline for filing the notice of appeal. *See In re K.A.F.*, 160 S.W.3d at 926. However, because the trial court actually modified and corrected its judgment while it retained plenary power jurisdiction to do so, the time for filing the notice of appeal must be calculated from the date of the new final judgment. The time for filing a notice of accelerated appeal is restarted not by the filing of the motion but by the act of the court. Thus, we conclude that the notice of appeal, filed three days after the signing of the corrected judgment, was timely. *See* TEX.R. CIV. P. 329b(h) ("If a judgment is modified, corrected, or reformed in any respect, the time for appeal shall run from the time the modified, corrected, or reformed judgment is signed...").

The Department contends, however, that the corrected final judgment in this case was simply a sham to extend the time for appeal. Relying on *Mackie v. McKen-*

*zie* and *Anderson v. Casebolt*, the Department argues that the appellate timetable should not restart when the record reveals that the trial court signed its new judgment "for the sole purpose of extending the appellate timetable." *Mackie v. McKenzie*, 890 S.W.2d 807, 808 (Tex.1994) (discussing *Anderson v. Casebolt*, 493 S.W.2d 509, 510 (Tex.1973)). The Department submits that any change to the judgment was purely cosmetic and solely for the purpose of extending Bettina's time for appeal.

In *Anderson*, the modified judgment was identical to the former judgment except for its date. 493 S.W.2d at 510. The trial court even stated that the modified judgment was issued because the "counsel for the plaintiff did not discover such entry [of the former judgment] until too late to file a motion for new trial...." *Id.* We held the appellate timetable did not restart because the record revealed that the modified judgment "could serve no purpose other than to enlarge the time for appeal." *Id.* at 510–11.

The changes made to the judgment in this case are not so transparent. They include: revising the docket number to reflect a severance of the case as to J.L. from the case concerning the infant; correcting an attorney's misspelled name; reflecting that the trial court, not just the jury, made the requisite findings for termination; deleting an erroneous reference to an inapplicable statute; and adding language regarding J.L.'s continued right to inherit from Bettina. In *Check v. Mitchell*, we held that "any change, whether or not material or substantial, made in a judgment while the trial court retains plenary power" will restart the appellate timetable from the date the modified judgment is signed. 758 S.W.2d 755, 756 (Tex. 1988). The trial court's changes to its judgment satisfy *Check's* standard and thus created a new judgment from which to calculate the time for appeal.

### III

Next, the Department argues that the court of appeals erred in taking judicial notice of the expert testimony of Dr. Harry Lee Wilson. Dr. Wilson was designated as an expert by the State in the criminal proceedings filed against Frank and Bettina. His testimony at a preliminary hearing in the criminal case appeared to contradict the autopsy performed by Dr. Moore. Dr. Wilson testified that Hallie had experienced trauma to her abdomen at least a week prior to her death, her rib fractures were likely caused by her accidental fall from a merry-go-round weeks earlier, and her areas of acute bleeding were caused by CPR. In contrast, Dr. Moore's autopsy indicated that Hallie had died soon after experiencing blunt force trauma to her abdomen and that her rib fractures and areas of acute bleeding had been caused by abuse. Dr. Moore testified for the Department in this case. Dr. Wilson's testimony in the criminal proceeding occurred nearly two years later, after this case was already pending in the court of appeals.

To bring this new evidence to the court of appeals' attention, Bettina filed a motion to abate the appeal and to remand the case to the trial court for a new hearing. She argued that the State had changed its position on the cause of Hallie's death by using Dr. Wilson instead of Dr. Moore. Rather than rule on Bettina's motion, the court of appeals took judicial notice of Dr. Wilson's testimony, including it as part of its analysis of the legal sufficiency of the evidence.

Bettina argues that the court of appeals correctly took judicial notice of Dr. Wilson's testimony under *Sparkman v. Maxwell*, 519 S.W.2d 852, 855 (Tex.1975). In

*Sparkman,* a party requested that we take judicial notice of the 1967 Texas Manual on Uniform Traffic Control Devices to resolve whether the court of appeals had erred in holding a traffic signal was legally installed. *Id.* Because the legality of the traffic signal was not a controlling issue in the case, we declined to take judicial notice of the 1967 manual. *Id.* Discussing appellate judicial notice, we stated:

> [A]n appellate court is naturally reluctant to take judicial notice of matters such as municipal charters and regulations promulgated by state agencies when the trial court was not requested to do so and was not given an opportunity to examine the necessary source material. *This does not mean that we would refuse to take judicial notice under similar circumstances where necessary to avoid an unjust judgment.*

*Id.* (citations omitted) (emphasis added).

■ Even assuming that this statement from *Sparks* may be read to create the opportunity for judicial notice of new evidence to avoid an unjust judgment, it would not apply to the expert testimony at issue here. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Tex.R. Evid. 201(b). If a fact is generally known, then obviously no expert is needed. Moreover, expert testimony invariably concerns matters in dispute which are not capable of accurate resolution from outside, unquestioned sources. Because Dr. Wilson's testimony concerned disputed facts and opinions, it should not have been judicially noticed.

## IV

■ Finally, we must consider the Department's contention that the court of appeals erred in holding the evidence legally insufficient to support the termination of Bettina's parental rights. The decision to terminate parental rights must be supported by clear and convincing evidence. *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex.2002). Under the clear and convincing standard, to be legally sufficient, the evidence must be such that "a factfinder could reasonably form a firm belief or conviction about the truth" of the allegation. *Id.* at 266. Thus, there must not only be evidence to support the relevant finding but also that evidence must produce "a firm belief or conviction that the allegation is true." *S.W. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 621, 2004 WL 3019205, at *11 (Tex.2004).

■ To terminate parental rights, the trial court must make two findings. First, the parent must have committed one of the acts prohibited under section 161.001(1) of the Texas Family Code, and second, the termination of parental rights must be in the child's best interest. Tex. Fam.Code § 161.001(1)-(2). Here, the trial court found that the Department had proven by clear and convincing evidence that Bettina had (1) knowingly placed or knowingly allowed J.L. to remain in conditions or surroundings which endangered his physical or emotional well-being; and (2) engaged in conduct or knowingly placed J.L. with persons who engaged in conduct that endangered J.L.'s physical or emotional well-being. Tex. Fam.Code § 161.001(1)(D), (E). The trial court also found that the termination of Bettina's parental rights was in the best interest of J.L. Tex. Fam. Code § 161.001(2).

In *In re J.F.C.,* we outlined the procedure for conducting a legal sufficiency review of parental-rights termination cases as follows:

In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

96 S.W.3d 256, 266 (Tex.2002) (citations omitted).

### A

In our legal sufficiency review, we first consider the evidence supporting the jury's finding that Bettina (1) knowingly placed or knowingly allowed J.L. to remain in conditions or surroundings which endangered his physical or emotional well-being; and (2) engaged in conduct or knowingly placed J.L. with persons who engaged in conduct that endangered J.L.'s physical or emotional well-being. TEX. FAM.CODE § 161.001(1)(D), (E). In support of the jury verdict, the Department points to the following evidence:

- Bettina testified that Frank, her husband, would fly off the handle, lose his temper, and be too rough with Hallie and J.L., his stepchildren. She and Frank had arguments about how he disciplined Hallie and J.L.

- The Department presented evidence of two incidents involving Frank's rough discipline of the children. In December 1998, Frank spanked J.L. with a belt to discipline him for hitting Hallie over the head with a plastic t-ball bat; the spanking left a red mark on J.L.'s hand. On April 24, 2000, Hallie urinated in her pants during a family trip to Walmart. An angry Frank lifted Hallie by one arm to put her into the car and used his foot to push Hallie into the house when the family arrived home. After the Walmart incident, Bettina argued with Frank about his treatment of Hallie and said she would get a babysitter if Frank could not handle keeping the kids. The argument lead to a physical confrontation with Bettina hitting Frank and ended with Frank pushing Bettina onto the bed. Despite the Walmart incident, Bettina continued to leave the children in Frank's care. Frank was the primary caretaker of the children on the day Hallie died.

- The Department presented evidence that Bettina was neglectful in seeking health care for her child. In December 1998, Hallie was ill for five days before Bettina took her to the hospital, where she was diagnosed as having suffered a stroke. On May 3, 2000, aware that Hallie had vomited three times that day, Bettina consid-

ered taking her to a doctor but decided against it, "because CPS [was] going to hound" them. Leaving Hallie in Frank's care, Bettina left the house with J.L. to visit a friend. While Bettina was gone, Hallie vomited a fourth time. When Bettina came home, she noticed that Hallie was not breathing normally and took Hallie to bed with her and Frank. Soon after, Bettina noticed Hallie had turned blue and stopped breathing. Bettina called 911, and Frank attempted CPR. Hallie was taken to the hospital in an ambulance and pronounced dead at midnight. The Department presented evidence that Hallie required a higher level of care than a normal child, based on her medical history, which included a diagnosis of asthma, a hospitalization in June 1998 for an E. coli bacterial infection, and a hospitalization in December 1998 for suffering a stroke and seizures. Despite Hallie's medical history, Bettina failed to promptly seek medical care for Hallie's illness on May 3, 2000.

- As evidence that Frank's rough treatment caused Hallie's death, the Department presented the expert testimony of Dr. Moore, the medical examiner who performed the autopsy on Hallie. Dr. Moore testified that Hallie's death was a homicide and that she died of blunt force trauma to the abdomen shortly after suffering a blow that was equivalent to a fall from a ten-story building. Dr. Moore testified that the blunt force trauma causing Hallie's death was not likely inflicted by CPR attempts to revive her, another child jumping on her, or her fall from a staircase or a merry-go-round accident that occurred a few weeks prior to her death.

- The guardian ad litem recommended Bettina's parental rights to J.L. be

terminated. His recommendation was based on Dr. Moore's autopsy report concerning the cause of Hallie's death and the fact that the Department had previously investigated Bettina and Frank in December 1998 concerning Hallie's stroke.

We must also consider the undisputed evidence that does not support the jury's finding that Bettina endangered J.L. under sections 161.001(1)(D) and (E).

- In December 1998, the Department conducted two separate investigations of Bettina and Frank. One investigation concerned the bruise on J.L.'s hand from the spanking Frank gave him with a belt. The other investigation related to the stroke Hallie suffered. In both investigations, the Department determined there was no abuse.

- The hospital evaluated Hallie for abuse when she was admitted in December 1998. The hospital records reflect that Hallie's stroke and seizures were not caused by abuse.

- Dr. Moore testified that there were no bruises on Hallie's abdomen despite the medical conclusion that Hallie died from blunt force trauma to the abdomen.

- Both Dr. Moore and Dr. Paul Radelat, Bettina's expert, testified that Hallie's symptoms would not necessarily have been such as to alert Bettina and Frank that Hallie needed emergency care.

- At the hospital after Hallie's death, Chris Edwards, the biological father of Hallie and J.L., shook Frank's hand and thanked him for taking care of his kids.

Viewing all of this evidence in the light most favorable to the jury's verdict and recognizing that the jury is the sole arbiter

when assessing the credibility and demeanor of witnesses, we conclude that a reasonable factfinder could form a firm belief or conviction that Bettina (1) knowingly placed or knowingly allowed J.L. to remain in conditions or surroundings which endangered his physical or emotional well-being; and (2) engaged in conduct or knowingly placed J.L. with persons who engaged in conduct that endangered J.L.'s physical or emotional well-being. TEX. FAM.CODE § 161.001(1)(D), (E).

## B

■ Next, we evaluate the evidence in support of the jury's finding that the termination of Bettina's parental rights was in J.L.'s best interest. TEX. FAM.CODE § 161.001(2). The jury charge instructed that some factors to consider in determining the best interest of the child were: the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parenting ability of the individuals seeking custody; the programs available to assist those individuals to promote the best interest of the child; the plans for the child by those individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. As support for the jury's finding concerning J.L.'s best interest, we consider all the evidence previously listed in support of the finding that Bettina endangered J.L. in the manner described by sections 161.001(1)(D) and (E). In addition, the following evidence also supports the jury's finding that the termination was in J.L.'s best interest:

● The guardian ad litem testified that because Bettina was continuing to live with Frank, the man accused of killing Hallie, J.L. would be in a safer environment with Chris Edwards, his biological father.

● The Department case manager also testified that J.L. was in a safer environment by being placed with Chris, rather than Bettina.

● The Department presented evidence that Bettina had financial difficulties after Hallie's death and had unstable living arrangements that caused her to move often.

● Chris lives with his grandmother, as he has done for most of his life. His family is close, and he has many relatives living nearby. Bettina's psychologist testified that Bettina did not have much family support. Bettina was estranged from her father, had lost her mother to cancer, found no support from her drug-addicted brother, and had many other relatives living out of state.

We also consider the undisputed evidence that does not support the jury's finding that the termination of Bettina's parental rights was in the best interest of J.L.:

● After Hallie's death, as recommended by the Department, Bettina completed a psychological evaluation, attended parenting classes, and went to therapy sessions with a psychologist. Chris did not attend the parenting classes recommended by the Department because he felt he did not need them.

● At the time of trial, Bettina was employed with a law firm and was attending school part-time, studying to become a paralegal. Prior to Hallie's death, Bettina had worked at a grocery store for four-and-a-half years. Chris testified that he has had at least six different jobs between 1995–2001, was employed only about 50% of that

time, and was unemployed at the time of trial. He loses his jobs when his sickle-cell disease makes him sick for three to four days at a time. He is typically sick from his sickle-cell disease about four to five times a year.

● Chris' child support payments to Bettina for Hallie and J.L. were in arrears. He had missed at least six months of payments in 1999. He also is required to pay child support for two older daughters that he had with another woman.

● Chris testified that it was good for J.L.'s emotional well-being to be allowed to see his mother in the future. Whether Bettina has a legal right to visit J.L. or not, Chris testified that he would allow her visitation as long as Frank was not present.

● Chris' testimony indicated that he, at age 27, has lived with his grandmother his entire life, except for the one year he lived with Bettina, during which time Chris was unemployed and Bettina paid the bills. Chris testified that he now contributes to at least half of his grandmother's bills.

● Chris testified that, while in his custody, J.L.'s bedtime, at age 5, has been about 10:00 p.m. or 11:00 p.m. Since obtaining custody of J.L., Chris has been home most nights to tuck J.L. into bed unless he is out at dinner or a movie or something.

● Chris testified that in the past, he sold LSD. He was arrested and charged with delivery of a controlled substance, but the charges were later dropped.

In spite of this undisputed evidence, when considering all the evidence in the light most favorable to the verdict, a factfinder could reasonably form a firm belief or conviction that the termination of Bettina's parental rights was in J.L.'s best in-terest. Therefore, the evidence, under a clear and convincing standard, is legally sufficient to support the jury's findings that Bettina endangered J.L. under sections 161.001(1)(D),(E) and that the termination was in J.L.'s best interest.

\*　　\*　　\*　　\*　　\*　　\*

For the foregoing reasons, we reverse the court of appeals' judgment and remand the case to the court of appeals to consider Bettina's complaints about the factual sufficiency of the evidence.