

# NUMBER 13-24-00137-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF L.L., L.L., L.L., CHILDREN

## ON APPEAL FROM THE COUNTY COURT AT LAW
## OF ARANSAS COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña**
**Memorandum Opinion by Justice Tijerina**

Appellants L.L., the father, and J.L., the mother, appeal the trial court's termination of their parental rights to their minor children, Veronica, Anthony, and Tammie.[1] By six issues, L.L. contends that there is legally and factually insufficient evidence to support the trial court's termination grounds or that termination of his parental rights was in the children's best interest (issues one through four), and that "several exhibits were

---

[1] We refer to the parties by initials and the children by aliases in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

improperly admitted into evidence" (issue five). By one issue, J.L. contends that it was not in the children's best interest to terminate her parental rights. We affirm.

## I. BACKGROUND

On December 16, 2022, J.L. called for an ambulance because her one-year-old daughter, Veronica, was in respiratory distress. Veronica was admitted to the children's hospital. Veronica had previously been diagnosed with several ailments. On December 19, 2022, the Texas Department of Family and Protective Services (the Department) received a report alleging that J.L. and L.L. had committed neglectful supervision of the children, including medical and physical neglect. The Department took custody of Veronica and Tammie, who was four years old. However, according to the Department, L.L. had taken and hidden Anthony, who was five-years old at that time. On January 5, 2023, the trial court ordered removal of the children from the parents, and it named the Department the temporary managing conservator of the children on January 26, 2023.[2]

According to a status hearing order, the trial court held a hearing on February 28, 2023, at which it found that: (1) J.L. had "not furnished to the Department all available information necessary to locate [L.L.] through the parent locater service"; (2) J.L.'s visitation with the children "must be supervised to protect the health and safety of" the children, and her visitation had been suspended until she initiated "services" and "turned [Anthony] over" to the Department; (3) L.L.'s visitation with the children would not be in the children's best interest because L.L. had not initiated services, Anthony was missing,

---

[2] On January 11, 2023, the trial court signed an order for the issuance of a writ of attachment commanding a peace officer to "take [Anthony] and deliver [him] safely into the possession of the [Department]." Antony remained missing until March 2023.

2

and L.L. had not given Anthony to the Department; and (4) L.L. was required to "return [Anthony] to the Department and comply with the Department's family plan" to regain visitation.

At trial, Glenda Rosales, a Department employee, testified that "[t]here was a delay in [Veronica's] discharge" from the hospital and that "[J.L.] was not answering any phone calls from the hospital."[3] According to Rosales, the hospital was unable to reach J.L. and L.L., and therefore, "[t]here was nobody able to make decisions for [Veronica,] and the Department could not do that for the parents at the time." Rosales explained that because "the Department was having a difficult time getting ahold of either parent," it contacted and visited several other family members, including J.L.'s mother. According to Rosales, the Department had "concerns" about J.L.'s mother's "home environment" because when two investigators visited J.L.'s mother's home, there was "an odor of marijuana" and J.L.'s mother "was not giving information [about] where [the smell] was coming from." The Department did not place the children with J.L.'s mother.

Rosales said that members of L.L.'s family gave the Department L.L.'s phone number and address. They also provided addresses of L.L.'s relatives. However, Rosales

---

[3] The trial court admitted an affidavit in support of emergency removal by another Department employee, Gustavo Ramon, through Rosales's testimony. The parents' trial counsel objected to admission of this document on the basis that the document contained hearsay within hearsay. L.L. asked for a running objection to Rosales's testimony that relied on the removal affidavit, which the trial court granted.

On appeal, L.L. generally asserts that Rosales relied on the removal affidavit during her testimony. However, he generally cites the entirety of her testimony and does not specifically identify which parts of her testimony should have been excluded on this basis. It is unclear from the record that Rosales relied on the removal affidavit for the entirety of her testimony. In some instances, the Department clearly asked Rosales to testify by reading or referring to the removal affidavit; however, in other instances, Rosales appeared to have personal knowledge of the facts. Because we are assuming, without deciding, the inadmissibility of the removal affidavit, we will not consider Rosales's testimony to the extent that she clearly referred to the affidavit.

testified that the Department could not contact L.L. "throughout the lifetime of the case." The family members informed the Department that L.L. had "fled to Houston." Rosales testified that during this period, Anthony, a five-year-old child, was missing, and "it was alleged that [Anthony] was with [L.L.]" Rosales testified that Anthony remained missing when the trial court ordered removal of the children on January 5, 2023.

Ronnie Mitchell, a Department employee, testified that "in March of 2023," law enforcement officers notified him that the officers were at a residence in Corpus Christi, Texas, where the officers had located Anthony. Mitchell stated that he was told to wait for further instructions, and subsequently, a U.S. Marshal called him to retrieve Anthony. When Mitchell arrived at the residence, he saw "a heavy law enforcement presence," who "were in tactical gear and had long rifles." Mitchell testified that he escorted Anthony to the children's hospital.[4] According to Mitchell, he showed Anthony several pictures taken of the inside of the residence and asked Anthony to point to the room where Anthony had slept. Mitchell testified that Anthony said that he slept in the room depicted in Exhibits 32 and 37, which show an extremely filthy bathroom. The pictures show that the tub is dirty and filled with junk and debris, and the residence is uninhabitable. There is no bed or area that is clean in the bathroom for a child to have slept. Mitchell observed drug paraphernalia at the residence. Mitchell testified that Anthony saw the pictures of the residence and said, "Me and my father were smoking that shit. . . . [We] were smoking something green and brown." Anthony further stated "[t]hat a cousin of his would make

---

[4] It is not entirely clear from the record how Anthony was located by law enforcement or who else was in the residence when he was found. Tammie and Veronica had already been placed in foster care.

him suck his private part" and "pointed to his penis area." After the Department took custody of Anthony, he had a dental procedure to remove nineteen decayed teeth. The dentist's records indicate that Anthony had a history of drug use.

J.L. testified that beginning in December 2022, she lived in San Antonio, while L.L. lived in Houston, and Tammie and Veronica lived with her mother. According to J.L., she was visiting her mother when Veronica became ill. When asked about the children's health issues, J.L. denied there were any and claimed the children were up to date with their "shots." J.L. admitted that due to a lack of transportation, she failed to take Veronica to numerous medical appointments. J.L. admitted that when she was pregnant with Veronica, she did not "see a physician or pediatrician" but claimed nonetheless that she had "prenatal care" because she "bought over the counter vitamins." J.L. admitted that she took prescription "pain killers" and smoked marijuana when pregnant with Veronica.

J.L. stated that shortly after Veronica's admission to the children's hospital, she was also admitted to another hospital because she had pneumonia and was in the hospital for approximately two weeks. When J.L. was released, Veronica was still at the children's hospital. J.L. claimed that no one from the hospital called to inform her of Veronica's release date. J.L. admitted that she did not provide her address to the hospital. J.L. thought that she found out that Veronica had been released in February or March. J.L. acknowledged that she had not taken any of the children to the dentist. On cross-examination by the children's attorney ad litem, J.L. acknowledged that she had not been "properly caring for the medical and dental needs of [the] children" prior to their removal, and she said, "I believe I should have taken them to the doctor [and dentist] when they

5

were supposed to [go]." J.L. continued, "Also, I should have taken them and made the appointments."

J.L. testified that on a previous occasion, Anthony "got a hold of a joint that [her] nephew was smoking[,] and he stuck it in his mouth and it made him sick." The Department asked, "[Anthony] died. Had to be resuscitated; is that right?" J.L. responded, "Yes." J.L. acknowledged that the Department became involved with the family after another incident "when [Anthony] was in a photograph with a 17-year[-]old who appeared to be smoking a blunt." J.L. replied, "I believe [the seventeen-year-old] was my stepson." J.L. denied that the children had been exposed to drugs while under her care; however, on cross-examination by the children's attorney ad litem, J.L. stated that it was "possible" that the children had been "exposed to drugs while they were in someone else's care." J.L. admitted that she tested positive for opiates after the Department's first removal of the children and while pregnant with Veronica in 2019.

J.L. explained that when law enforcement found Anthony, she was arrested for her involvement in his disappearance. J.L. acknowledged that she knew that the Department had been appointed Anthony's temporary managing conservator and that L.L. had taken Anthony to Houston. On October 30, 2023, J.L. pleaded guilty to three counts of interference with child custody.[5] L.L. was also indicted for three counts of interference with child custody. J.L. and L.L. were incarcerated at the time of the trial.[6]

---

[5] The record shows that J.L. was sentenced to two years' confinement, which the trial court probated for five years, and that she was incarcerated when the parental termination trial occurred. J.L. was incarcerated in March 2023.

[6] There is no other information in the record regarding L.L.'s criminal case.

J.L. claimed that she was unaware that Anthony tested positive for cocaine when he was found. J.L. agreed that the conditions of the home where the Department located Anthony were not appropriate for a child. However, J.L. denied that Anthony had been living there and claimed that he had only been visiting for the weekend. J.L. recalled that she had informed the trial court that so long as he was with L.L., Anthony was "safe and doing fine." When told that was "not the case," J.L. replied, "I still believe that he was taking good care of him. Somebody could have—somebody in the house or wherever he was at, he could have got ahold of something and [L.L.] didn't know about it."

Ashley Banda, a Department employee, testified that the children were living in Houston, although Veronica was not living with Anthony and Tammie. Banda said that the placements were "going extremely well" and the children's basic needs were being met, including medical and school. According to Banda, Veronica requires "24/7 nursing assistance[,] . . . has . . . low muscle tone[,] . . . has a hip dislocation that's being corrected, special shoes . . . [and] has a G-tube." Banda explained that a G-tube, or gastrostomy tube, is "a feeding device [that is] connected to [Veronica's] belly button [which] provid[es] nutrients [that] she needs." Banda said, "Physically they are improving in health [and] their overall well-being. . . . [Veronica] is gaining weight. Her aspirating is still there with the G-tube helping. She has speech therapy, occupational therapy, physical therapy. That's all helping her throat muscles, coordination, her eye movement is improving." Banda stated that Anthony still has "days of his behaviors," but he has made an "overall improvement." Banda testified Tammie "is continuously doing well" as "there weren't many issues with" her.

7

Banda said that the children "appear to be happy," have not complained about their placements, and "they do not want to go home." Banda thought that their current placement is in their best interest. Anthony told Banda that he does not want to be returned to J.L. or L.L. "because they eat drugs. They force him to eat drugs. They hit him, [are] mean to him. They are bad people and they are in jail." On cross-examination by the children's guardian attorney ad litem, Banda said that Anthony had never referred to his parents as "mom and dad" and instead refers to them by their respective first names. Banda testified that Anthony had never "used any other term [that] is customary for a child to use for their parents other than their first names" and Tammie has also never referred to the parents as mom and dad. Banda stated that Tammie and Anthony call their foster mother "mom."

According to Banda, Veronica's foster mother plans to adopt her and Tammie and Anthony's foster mother is also considering adoption. Banda testified that the foster parents are employed, and the homes are "[a]ppropriate" and stable. Banda described the stability of the homes as follows:

> They are meeting the . . . children's needs. They provide the care they need. It's a safe home. We do walk-throughs. They have light, groceries. They are always taking the kids to the doctors. They provide any and every kind of therapies that they need. They take them for outings. The children meet with each other and visit with each other virtually and in person.

Regarding the family plan, Banda stated that J.L. and L.L. had made no progress because at first "they chose not to do anything," and then they were incarcerated. None of the "Family Plan of Service" had been completed. On redirect examination by the Department, Banda clarified that J.L. could have started her services on February 2,

8

2023, which is before she was incarcerated; however, "it was her choice" not to begin them. Banda did not address whether L.L. could have started his services at that time.

Banda did not believe that the parents had "demonstrated proper parenting" skills. Banda testified J.L. and L.L. had not "been willing to seek out and accept and complete programs" that were available to them, while the foster parents had "been willing to accept" programs meant to assist in parenting the children. Banda relayed that the Department's "greatest concern" regarding the parents' parenting skills was that they engaged in "[n]eglectful supervision, medical neglect for [Veronica], [and] physical neglect."

Banda emphasized that the children had been removed "three times in five years." Banda explained that the Department had previously removed Tammie and Anthony from L.L. and J.L.'s custody once "[i]n 2018, . . . for physical abuse of [Anthony]" because "[h]e tested positive for marijuana and cocaine" and then again "[i]n March 2019, [due to] neglectful supervision." Banda relayed that L.L. and J.L. had a "history of substance abuse." Banda testified that Veronica "had meconium positive for methadone" at birth. On cross-examination by J.L.'s trial counsel, Banda agreed that "drugs have a part to play" in why the parents were not able to complete services.

The trial court terminated the parental rights to both parents. In its order, the court found that both parents: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger their physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the children's physical or

9

emotional well-being, *see id.* § 161.001(b)(1)(E); and (3) contumaciously refused to submit to a reasonable and lawful order of a court under Subchapter D, Chapter 261 of the family code. *See id.* § 161.001(b)(1)(I). The court also found that termination of both parents' rights was in the best interest of the children. *See id.* § 161.001(b)(2). This appeal followed.

## III. TERMINATION

By his first through third issues, L.L. contends that the evidence is legally and factually insufficient to support the trial court's findings as to the statutory grounds for termination.[7] By his fourth issue and by her sole issue, L.L. and J.L. contend that the evidence is insufficient to support a best interest finding.

### A. Standard of Review

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent

---

[7] Only one statutory ground finding is necessary to support a judgment of termination, but in *In re N.G.*, "the Texas Supreme Court held that due process demands that we review the evidence supporting findings under Grounds D and E when they are challenged on appeal because termination of parental rights under these Grounds 'may have implications for . . . parental rights to other children.'" *In re L.W.*, 609 S.W.3d 189, 195–96 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam)). Therefore, we will address both grounds in our analysis.

committed one of the acts or omissions prohibited by § 161.001(b)(1) of the Texas Family Code. TEX. FAM. CODE ANN. § 161.001(1); *In re J.L.*, 163 S.W.3d at 84. The trial court must also find by clear and convincing evidence that termination of parental rights is in the children's best interest. TEX. FAM. CODE ANN. § 161.001(b)(2); *see id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM CODE ANN. § 101.007.

When a party challenges a trial court's findings of fact on legal or factual sufficiency grounds, we review the trial court's findings under the same sufficiency of the evidence standards used when determining if sufficient evidence exists to support jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d at 266); *In re D.S.P.*, 210 S.W.3d at 778. We must assume that the trier of fact resolved disputed facts in favor of its finding if it was

11

reasonable to do so. *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Under a factual sufficiency standard, we consider whether the

> disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

## B.    Applicable Law

Subsection 161.001(b)(1)(D) allows termination when the evidence proves by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection 161.001(b)(1)(E) allows termination if the parent has engaged in conduct or knowingly placed the child with persons who engage in conduct which endangers the child's physical or emotional well-being. *Id.* § 161.001(b)(1)(E). Endanger is defined as exposing to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "The child need not actually suffer injury, however, endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.*

"Subsection (D) focuses on the child's living environment and refers to the suitability of the child's living conditions and of the parent's conduct in the home." *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (applying TEX. FAM. CODE ANN. § 161.001(b)(1)(D)). "[I]nappropriate, debauching, unlawful or unnatural conduct of

12

persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis" are "inherently part of the 'conditions and surroundings'" of the child and subsection (D) is "manifestly designed to protect children against just such an environment." *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (E), on the other hand, focuses on the parent's involvement in a conscious course of conduct including not only acts but also omissions or failures to act that endanger the child. *In re E.G.*, 643 S.W.3d 236, 252 (Tex. App.—Amarillo 2022, no pet.). The specific danger to the child's well-being may be inferred from the parent's conduct and need not be established as an "independent proposition." *Id.* The evidence pertaining to § 161.001(b)(1)(D) and (E) are interrelated, and we may therefore conduct a consolidated review. *In re J.W.*, 645 S.W.3d at 749 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.)).

## C.    Analysis[8]

A parent's continuous "criminal behavior evinces a course of conduct that a

---

[8] For purposes of L.L.'s first four issues and J.L.'s issue, [w]e are assuming without deciding that several documents the trial court admitted over L.L.'s objection, and which he complains of on appeal, constituted inadmissible hearsay. Therefore, we will not consider that evidence for purposes of our sufficiency analysis. This evidence includes the following: (1) State's Exhibit 1, a status report by Department employee Kennedy Toungate; (2) State's Exhibit 7, Toungate's permanency report; (3) State's Exhibit 10, a permanency report drafted by Banda; (4) State's Exhibit 13, Ramon's removal affidavit; (5) State's Exhibit 15, Ramon's affidavit in support of writ of attachment; (6) Toungate's affidavit; and (7) State's Exhibit 23, Banda's "Review Report to the Court." *See Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 567 (Tex. App.—El Paso 2016, pet. denied) (explaining that we may consider hearsay in our legal sufficiency review only if it is admitted without objection); *Kenny v. Portfolio Recovery Assocs., LLC*, 464 S.W.3d 29, 33 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (recognizing that the inadmissible portions of a business records affidavit cannot be considered in legal sufficiency review); *Marshall v. Telecomms. Specialists*, 806 S.W.2d 904, 907 (Tex. App.—Houston [1st Dist.] 1991, no writ) (refusing to consider inadmissible hearsay in determining sufficiency of evidence on appeal); *Cottle v. Knapper*, 571 S.W.2d 59, 62 (Tex. App.—Tyler 1978, no writ) (refusing to consider admissible testimony in determining sufficiency of evidence on appeal); *Tex. Dep't of Pub. Safety v. Nesmith*, 559 S.W.2d 443, 447 (Tex. App.—Corpus Christi 1977, no writ) (holding that incompetent evidence, although admitted at trial, should not be considered on appeal as having any probative value).

factfinder reasonably could conclude endangers [the children's] well-being." *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Here, both L.L. and J.L. pleaded guilty to three counts of interference with child custody occurring after the Department removed the children. *See* TEX. PENAL CODE ANN. § 25.03(a)(1) (providing that it is a state jail felony for a person to "take[] or retain[] a child younger than 18 years of age . . . when the person knows that the person's taking or retention violates the express terms of a judgment or order, including a temporary order, of a court disposing of the child's custody"). The evidence shows that L.L. and J.L. absconded from police for several months to avoid the Department's removal of Anthony. By pleading guilty to this criminal offense, L.L. and J.L. admitted that L.L. took Anthony knowing that the Department was Anthony's conservator. *See id.*; *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (concluding that past criminal conduct and behavior qualified as a voluntary, deliberate, and conscious course of conduct endangering the child's emotional well-being).

"While imprisonment alone is not a basis to terminate a parent's rights, it is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being." *In re M.R.J.M.*, 280 S.W.3d at 503. Here, after receiving suspended sentences for the offense of interference with child custody, L.L. and J.L. were re-arrested during the pendency of the termination proceedings and were incarcerated at the time of the trial, therefore making it impossible for them to complete their family service plans. *See In re R.W.*, 129 S.W.3d 732, 739

(Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (concluding that the parent violating parole provided sufficient evidence of endangerment). No evidence regarding when either parent would be released was presented. *See In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.) (concluding evidence of criminal conduct, convictions, and imprisonment and their effect on the parent's life and ability to parent may establish an endangering course of conduct); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("If the imprisonment of the parent displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct that endangers the child.").

Illegal drug use and drug-related criminal activity by a parent supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.); *In re S.D.*, 980 S.W.2d at 763. "'And where the record contains evidence that a parent engages in drug use during the pendency of a termination suit, when he knows he is at risk of losing his children,' such evidence has been found legally sufficient to support a finding of endangerment under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied). J.L. and L.L. had a history of drug use, and J.L. admitted that she used drugs while pregnant with Veronica. Anthony said that he smoked green and brown "shit" with L.L. during the pendency of the termination suit and that both parents

15

made him "eat drugs." *See id.* Anthony told Banda that the parents were mean and hit him. *See In re W.S.*, 899 S.W.2d 772, 776–77 (Tex. App.—Fort Worth 1995, no writ) (explaining that a parent's abusive conduct may produce an environment that endangers the physical or emotional well-being of a child); *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Evidence that L.L. used drugs alone and with Anthony while the Department had custody of Anthony, and that he refused to turn Anthony over to the Department's care knowing that he was at risk of losing custody of the children, supports a finding that L.L. engaged in conduct that endangered the children's physical and emotional well-being. *See In re E.R.W.*, 528 S.W.3d 251, 264–65 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). Moreover, L.L. disregarded the threat of incarceration when he hid Anthony from the Department and gave Anthony drugs to ingest. *See In re J.S.*, 675 S.W.3d at 128. Evidence that the parents used drugs and they encouraged Anthony to use drugs "can support the conclusion that the [children's] surroundings endanger[ed] [their] physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the [children's] well-being under subsection (E)." *In re C.V.L.*, 591 S.W.3d at 751.

There does not need to be evidence that the parent "inflicted direct physical abuse on [the] children," so long as "there is evidence that [the parent] neglected [the children's] physical needs, and neglect can be just as dangerous to the well-being of a child as direct physical abuse." *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam); *see also In*

16

*re E.J.*, No. 14-23-00387-CV, 2023 WL 8043686, at *9 (Tex. App.—Houston [14th Dist.] Nov. 21, 2023, no pet.) (mem. op.) ("A parent's failure to properly supervise her young children endangers the children's physical or emotional well-being."). Furthermore, Anthony was rescued by a Department employee from a dangerous environment after a SWAT team raided the residence. J.L. and L.L. allowed Anthony to stay in a residence that was deplorable, uninhabitable, and had drug paraphernalia. Anthony told Mitchell that his cousin sexually assaulted him while in L.L.'s care. Although no evidence was presented that L.L. knew of the sexual abuse, the trial court could have reasonably inferred that both J.L. and L.L. had acted negligently by placing Anthony in situations that were dangerous based on evidence that Anthony, a five-year-old child, had previously overdosed and almost died in the past, Anthony had been in the company of another juvenile smoking a "blunt," and the parents left Veronica unaccompanied at the hospital. *See J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.— El Paso 2014, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards."); *see also In re E.J.,* 2023 WL 8043686, at *9.

Additionally, a parent's neglect of the child's medical needs "is evidence a trial court may consider as conduct endangering the child." *In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio May 17, 2017, no pet.). The trial court heard evidence that J.L. and L.L. neglected the medical needs of Veronica and Anthony by failing to take them to medical appointments and abandoning Veronica in the hospital with no one to help make medical decisions for her. *See id.*; *see also In re H.M.O.L.*, No. 01-17-00777-CV, 2018,

WL 1659981, at *13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.). J.L. acknowledged that she was unaware that the hospital had released Veronica and discovered her release several weeks afterwards. There is no evidence L.L. ever knew of Veronica's hospitalization because he was absconding from the authorities with Anthony at that time. *See In re M.C.*, 917 S.W.2d at 269–70 (examining a parent's behavior of leaving a child alone in a potentially dangerous situation as a factor in determining whether to terminate parental rights). Finally, L.L. did not inquire about Veronica's condition or visit her in the hospital when she was admitted.

J.L. admitted that neither she nor L.L. had taken any of the children to the dentist. Due to the lack of dental care, surgery was necessary to extract at least nineteen of Anthony's teeth. The doctor's notes indicate that Anthony's condition was "critical," and removal of the teeth was needed as soon as possible. The doctor noted that Anthony had "a history of drug use." Pictures of the teeth were admitted into evidence showing the state of the decay, which was substantial. The notes indicate that the doctor had to sedate Anthony due to the discomfort of the surgery and the child's apprehension. From this evidence, the trial court could have reasonably found that L.L. and J.L. had not provided appropriate medical care for Anthony and Veronica. *See In re R.S.-T.*, 522 S.W.3d at 113.

Based on the foregoing and giving due deference to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that L.L. knowingly allowed the children to remain in an endangering environment and that he engaged in endangering conduct. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *see also In re E.M.*, No. 09-21-00317-CV, 2022 WL 1037756, at *8 (Tex. App.—Beaumont

18

Apr. 7, 2022, no pet.) (mem. op.) (setting out that the father's "ongoing drug use following the children's removal, his arrests, his decision to leave the children with an inappropriate caregiver, and his violent outbursts supported the trial court's" termination pursuant to § 161.001(1)(D) and (E)). Moreover, in light of the entire record, we conclude that the trial court could have formed a firm belief or conviction that L.L. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, and engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *see also In re J.F.C.*, 96 S.W.3d at 266. The evidence was legally and factually sufficient to support termination. We overrule L.L.'s first through third issues.[9]

## C. Best Interest

By his fourth issue, and by her sole issue, L.L. and J.L. challenge the legal and factual sufficiency of the evidence supporting a best interest finding.

In *Holley v. Adams*, the Texas Supreme Court provided the following nonexclusive list of factors for the trier of fact in a termination case to use in determining the best interest of the child: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans

---

[9] Because we conclude the evidence is factually and legally sufficient to support termination under Subsections (D) and (E), we do not need to review L.L.'s third issue challenging the sufficiency of the evidence under Subsection (I). *See* TEX. R. APP. P. 47.1; *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (noting only one ground is necessary to uphold termination).

19

for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976).

J.L. and L.L.'s acts and omissions which endanger the children's well-being as explained above are probative of a finding that the children have been in emotional and physical danger under L.L.'s and J.L.'s care, and would continue to be in such danger if returned to L.L. and J.L. This evidence all supports the trial court's best interest finding. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (providing that the same evidence of acts or omissions used to establish grounds for termination under § 161.001(1) may be probative in determining the best interests of the child). As previously mentioned, neither J.L. nor L.L. cooperated with the Department after the children were removed, and instead they hid Anthony from the Department. L.L. and J.L. have shown poor parenting abilities by, among other things, committing three counts of interference with child custody, hiding from the Department, claiming that they were unaware of Anthony's whereabouts, allowing Anthony to sleep in a filthy bathroom in an uninhabitable home, leaving Tammie with J.L.'s mother while they hid from the Department, allowing Tammie to stay in a home that smelled of marijuana, leaving Veronica in the hospital without providing an address, and being unavailable to provide permission for treatment when Veronica needed it. *See Walker*, 312 S.W.3d at 619 (noting that the parent lacked parental abilities and showed no interest in caring for the children, which supported a finding that termination was in the children's best interest); *See In re C.E.K.*, 214 S.W.3d 492, 498 (Tex. App.—Dallas 2006,

20

no pet.) (setting out that parents need to maintain stability for the children).

The Department previously removed Tammie and Anthony from the parents because Anthony almost died from a drug overdose. After this incident and after Anthony was returned to L.L. and J.L., the Department investigated the family once more because Anthony was pictured with an older sibling who was using drugs around Anthony. Then, J.L. tested positive for drugs while pregnant with Veronica, and Veronica tested positive too. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (explaining that a mother's drug use during pregnancy is a factor to consider in a best interest analysis); *see also In re S.R.*, 452 S.W.3d 351, 362 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Failure to maintain stability endangers the child's physical and emotional well-being."). Notwithstanding Anthony's drug overdose and near-death, L.L. used drugs in front of Anthony, and Anthony said that both parents made him "eat" drugs. *See In re T.L.E.*, 579 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("Violent or abusive acts directed toward one child can endanger other children that are not the direct victims of the abuse in question and support termination of parental rights as to the other children, even if the other children were not yet born at the time of the conduct.").

J.L. "believed" that L.L. "was taking good care of" Anthony, even though she knew that L.L had abducted him, kept in an uninhabitable home, and had given Anthony drugs. She claimed that "somebody" else could have been responsible for Anthony's drug use and that "[L.L.] didn't know about it." *See C.A.J.*, 122 S.W.3d at 893 (providing that, the trial court may consider the parent's inability to provide adequate care, lack of parenting

skills, and poor judgment in best interest analysis). However, the trial court could have reasonably disbelieved J.L.'s assertions. *See In re J.L.*, 163 S.W.3d at 85.

Nothing in the record indicates that either L.L. or J.L. have a plan to house the children as they are currently incarcerated, and there is nothing in the record showing when they will be released. Instead, L.L.'s trial counsel hinted that he wanted the children to be placed with J.L.'s mother, and J.L. testified that she wanted the same. However, J.L.'s mother's home smelled like marijuana when the Department visited her, and the Department determined that she is not a suitable caregiver for the children. *See Walker*, 312 S.W.3d at 619. Although given the opportunity prior to her incarceration, J.L. chose not to complete any of the ordered family services. There is no evidence regarding whether L.L. had an opportunity to complete the service plan prior to his incarceration. However, L.L. had absconded and was hiding from the Department after the trial court ordered the removal of the children, and he chose not to cooperate with the Department as he was hiding Anthony's location from the Department.

It is a compelling state interest to establish a stable and permanent home for the children, and the Department has shown that the foster parents are able to do this for the children, while L.L. and J.L. have shown otherwise. *See In re S.R.*, 452 S.W.3d at 367 ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs."); *In re C.E.K.*, 214 S.W.3d at 498; *Doyle v. Tex. Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (concluding that the termination is in the child's best interest when there is evidence that the parent failed to provide a stable home and provide for a

child's needs). The children are satisfied in their placement and have indicated that they would not like to be returned to L.L. and J.L. *See In re D.L.B.*, 943 S.W.2d 175, 178 (Tex. App.—San Antonio 1997, no writ) ("Testimony regarding a declarant's state of mind is an exception to the hearsay rule in a termination proceeding where evidence of the child's desire can be considered."). The children refer to the foster parents as mom and dad and refer to L.L. and J.L. by their first names. Moreover, the foster parents are providing the children with the proper medical treatment needed to progress, which L.L. and J.L. had neglected. *In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.) ("[W]e . . . presume that prompt and permanent placement of the child in a safe environment is in the child's best interest.").

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that that termination of L.L.'s and J.L.'s parental rights is in the children's best interest. *See In re J.L.*, 163 S.W.3d at 85; *In re D.S.P.*, 210 S.W.3d at 778. Moreover, in light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of L.L.'s parental rights and termination of J.L.'s parental rights was in the children's best interest. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination is in the best interest of the children. We overrule L.L.'s fourth issue and J.L.'s sole issue.

## IV. ADMISSION OF EVIDENCE

By his fifth issue, J.L. contends that several of the documents in evidence were inadmissible hearsay. Even assuming without deciding that the complained-of documents

were inadmissible, "the "erroneous admission of evidence is harmless unless the error probably (though not necessarily) caused rendition of an improper judgment." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871–75 (Tex. 2008). J.L. does not allege in his brief that he was harmed by the admission of the complained-of evidence. *See* TEX. R. APP. P. 38.1(i), 44.1(a).

Even assuming the issue was adequately briefed, we cannot conclude it has merit. The harm determination is based on a "review [of] the entire record, 'considering the state of the evidence, the strength and weakness of the case, and the verdict.'" *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015). The trial court also terminated L.L.'s parental rights pursuant to § 161.001(b)(1)(I), which allows the trial court to terminate the parent-child relationship if the parent "contumaciously refused to submit to a reasonable and lawful order of a court under Subchapter D, Chapter 261." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(I). L.L. pleaded guilty to interference with child custody. This evidence supports the trial court's termination of L.L.'s parental rights under § 161.001(b)(1)(I). *See id.* Moreover, we did not consider the documents that appellant claims on appeal were inadmissible in our sufficiency review, and we nonetheless concluded that the evidence is sufficient to support that termination was in the children's best interest and proper under Grounds D and E. *See Brown v. Hopkins*, 921 S.W.2d 306, 312 (Tex. App.—Corpus Christi–Edinburg 1996, no writ) ("A trial court's error in admitting testimony is harmful if the judgment was controlled by the testimony that should have been excluded."). Therefore, based upon our review of the entire record, considering the state of the evidence, the strength and weakness of the case, and the verdict, we cannot conclude

that the complained-of evidence, even if improperly admitted, probably caused the rendition of an improper verdict. *See* TEX. R. APP. P. 44.1(a)(1); *Reliance Steel & Aluminum Co.*, 267 S.W.3d at 871–75; *JLG Trucking, LLC*, 466 S.W.3d at 165. We overrule L.L.'s fifth issue.

### V.  CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
18th day of July, 2024.